Charles E. STONER, Jr.,
Petitioner–Appellant,

v.

Dewey SOWDERS, Warden,
Respondent–Appellee.

No. 92–5544.

United States Court of Appeals,
Sixth Circuit.

Submitted March 4, 1993.

Decided July 6, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 15, 1993.

---

* The Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Frank W. Heft, Jr. (briefed), Office of Jefferson Dist. Public Defender, Louisville, KY, for petitioner-appellant.

Perry T. Ryan, Asst. Atty. Gen. (briefed), Chris Gorman, Atty. Gen., Frankfort, KY, for respondent-appellee.

Before: MERRITT, Chief Judge, and JONES and NELSON, Circuit Judges.

MERRITT, Chief Judge.

Petitioner, Charles Stoner, now serving a 13–year sentence in Kentucky, seeks a writ of habeas corpus alleging that two constitutional errors were committed at his state trial. First, he contends that the state court denied his Sixth Amendment right to confront the witnesses against him by admitting videotaped depositions of two witnesses without a sufficient showing of their unavailability to give live testimony. The court allowed the witnesses to give the deposition at the local police station the day before the trial began, thereby avoiding giving live testimony and cross-examination in court. The trial court excused them from having to confront the defendant in open court the next day because of a brief doctor's note citing their advanced age and poor health. Second, Mr. Stoner

alleges that the prosecution violated his rights under the Equal Protection Clause of the Fourteenth Amendment by using peremptory challenges to improperly exclude African–Americans from the petit jury. Because we grant the petition on Confrontation Clause grounds, we need not reach the Equal Protection issue.

The indictment against Mr. Stoner charged two burglaries committed on the afternoon of November 19, 1986. The first home burglarized was owned by Mr. Carl Kaelin and his wife, the two witnesses allowed to testify by deposition. Mr. Kaelin says in his deposition that as he was walking through his kitchen he saw two men standing near the door to his backyard, one inside, one on the porch. The man standing inside the house, later identified by Mr. Kaelin as petitioner Stoner, asked some questions of Mr. Kaelin and then left. Mrs. Kaelin was gardening and saw the two men leave the house, but was too far away to be able to identify them later. She said she knew only that they were black and were wearing dark clothing. After the men ran away, the Kaelins noticed that two watches belonging to Mr. Kaelin that had been lying on their buffet were missing. They called the police.

Later that afternoon, a car pulled into the alley behind the home of Mrs. Viola Herman and two black men got out. A thirteen year old neighbor, Mathew Webb, saw the men enter the Herman home and told his mother who called the St. Matthews Police. An officer arrived just as the men were leaving Mrs. Herman's home. He pursued the first man but was unable to apprehend him. He called for assistance. Other officers arrested Mr. Stoner a short distance away. Both Mathew Webb and the first officer to arrive thought Mr. Stoner was the man they had seen based upon similarity of build and clothing. Neither had gotten a good enough view of his face to be able to positively identify him at trial.

Mrs. Herman was in her yard when the burglary occurred. She was unaware that anything was amiss until the squad car arrived, and although she saw the men run

from her home she was unable to identify either man. When she was allowed to reenter her home she found that her watch was missing. Her watch was never recovered, although Mr. Stoner was wearing four watches at the time of his arrest. Mr. Kaelin in his deposition identified two of these as his property.

Mr. Stoner was tried on two counts of second degree burglary, and the jury returned a guilty verdict on both. Mr. Stoner subsequently pled guilty to the charge of first degree persistent felony offender, while reserving the right to withdraw that plea if the substantive convictions were overturned on appeal. The trial court imposed an enhanced sentence of thirteen years imprisonment and final judgment was entered on June 30, 1988.

On direct appeal to the Kentucky Court of Appeals, Stoner's conviction was upheld. The Kentucky Supreme Court denied review on January 10, 1990, and the United States Supreme Court denied certiorari on April 16, 1990. Stoner then filed this petition with the United States District Court for the Western District of Kentucky, which denied it on March 19, 1992. This appeal follows.

The Kaelins, owners of the first home that the defendant allegedly burglarized, were elderly. The prosecution obtained a court order allowing the taking of their depositions.[1] The couple then traveled to the St. Matthews police station where a videotaped deposition was conducted the day before the trial began. Both Stoner and his trial counsel were present at the deposition. Through counsel, Stoner was afforded the opportunity to cross-examine the Kaelins.

The prosecution introduced the deposition the next day at trial. The defense objected on Confrontation Clause grounds. The trial judge sustained the objection after a suppression hearing because the prosecution had not shown that the witness was unavailable. Later in the proceedings the prosecution produced an affidavit from the Kaelins' doctor stating only that they were in "extremely poor physical health" and that "the physical

---

1. Kentucky Rule of Criminal Procedure 7.10 allows for the taking of depositions in criminal cases if it appears that a witness may be unavailable to testify at trial, or if the parties agree.

**212**

health of these patients could be impaired if they were subjected to the rigors of sitting through a jury trial." The judge then reconsidered her previous ruling and admitted the deposition.[2] There is no dispute that the doctor's affidavit alone was the justification for allowing the deposition. The trial judge said that she believed the affidavit cured her earlier concerns about the lack of evidence of unavailability. On appeal, the Kentucky Court of Appeals was doubtful but in the end allowed the depositions to substitute for live testimony.

> The depositions were admitted over objection. The appellant contends that, in view of the fact that the Kaelins were able to travel to the police department and depose on May 10, the day before the trial date, *the Commonwealth failed to show why they were unavailable to give the same testimony one day later in court. We find great legitimacy in this argument,* and would deem it virtually conclusive were it not for the doctor's affidavit, stated in the present tense and executed May 11.

Unpublished opinion of the Kentucky Ct. of Appeals, August 18, 1989 at 4 (emphasis added).

The Court of Appeals was influenced by the fact that the deposition was taken under circumstances that were similar to those at trial:

> We agree that the affidavit reveals less than exemplary practice under RCr 7.20. But in view of all the circumstances, including the facts that the accused was present at the deposition and that his trial counsel, on the eve of trial, had a full opportunity to cross-examine the witnesses, we cannot conclude that the court abused its reasonable discretion.

*Id.* Throughout the trial and the appeals process, Mr. Stoner and his counsel have objected to the admission of this evidence on the grounds that it violated the Confrontation Clause of the Sixth Amendment.

As the Kentucky court noted, the requirement of "unavailability" is a categorical constitutional rule. The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The phrase "witnesses against him" refers to those who give testimony at trial in court. The question before us is whether the Kaelins should be allowed to testify by deposition rather than be required to confront the defendant in open court.

█ The Supreme Court has observed that the "general requirement of unavailability" of the declarant has long been a part of Anglo–American jurisprudence. *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Both the Kentucky trial court and the Kentucky appellate court were right to express serious reservations about the procedure used here. The defendant was denied the usual right to confront and examine crucial witnesses before the jury in open court. He was denied this right because of a short, conclusory doctor's affidavit. The doctor's affidavit itself was hearsay. He was not produced or examined as to the basis of his conclusions even though the state had the burden of proving unavailability.

The Kaelins were not in fact "unavailable" in the literal or usual sense of the word. To say they were "unavailable" is a legal fiction. They were present and gave their deposition near the courthouse the day before the trial. They were in fact "available" to testify at the trial. They were "unavailable" only in the sense that they preferred not to testify and were in poor health according to the doctor's affidavit.

█ When the question is one of the health of the witness, there must be "the requisite finding of necessity" which is "case specific" in order to dispense with confrontation in open court. *Maryland v. Craig,* 497 U.S. 836, 855, 110 S.Ct. 3157, 3169, 111 L.Ed.2d 666 (1990). When the government is claiming witness unavailability due to illness, the specific inquiry must focus on both the severity and duration of the illness. The

---

2. Kentucky Rule of Criminal Procedure 7.20 allows the use of deposition testimony, or previous trial testimony if it is otherwise admissible under the Rules of Evidence, and if: "the witness is dead; or ....unable to attend or testify because of sickness or infirmity; or ... the party offering the deposition had been unable to procure the attendance of the witness by subpoena." Kentucky Rev.Stat.Ann. RCr 7.20 at 37 (Baldwin 1983).

court must inquire as to the specific symptoms of the illness to determine what tasks the patient is able to perform, and the court must determine whether there is the probability that the illness will last long enough "so that, with proper regard to the importance of the testimony, the trial cannot be postponed." *Burns v. Clusen,* 798 F.2d 931, 937–38 (7th Cir.1986). Here the trial court was not in position to make a finding on the question of necessity because it was not offered any specifics, and it did not in fact make such a finding. Thus the "requisite finding of necessity" required by the Supreme Court in *Craig* was not even addressed, much less found, in the instant case.

■ To allow trial by deposition here (whether video or written) to substitute for regular trial testimony would over time invite trial by deposition in many, perhaps most, criminal cases. Many witnesses would prefer not to testify in a criminal trial and can often find a doctor who will provide a cursory "doctor's excuse," a statement that the witness's physical or mental health "could" be adversely affected by having to appear. A prosecutor will often prefer to offer deposition testimony because the witness need not be secured for trial and need not be subject to the vicissitudes of cross examination before the jury. The result of such a rule allowing trial by deposition violates both the literal language and the purpose of the Confrontation Clause, assuring the right of the accused: "in all criminal prosecutions ... to be confronted with the witnesses against him." The Kentucky procedure used here may be easier and more efficient in terms of judicial and prosecutorial administration, and it may offer the same reliability that we require in civil cases. But the deposition is a weak substitute for live testimony, a substitute that the Sixth Amendment does not countenance on a routine basis. The Constitution does not allow us to so water down the explicit requirement of live testimony in criminal cases.

The State suggests that video depositions are almost as good as live testimony and not much is lost by not having first hand, face-to-face presence in court. That may be true in many cases, but still the jury and the judge never actually see the witness. The witness is not confronted in the courtroom situation.

The immediacy of a living person is lost. In the most important affairs of life, people approach each other in person, and television is no substitute for direct personal contact. Video tape is still a picture, not a life, and it does not come within the rule of the confrontation clause which insists on real life where possible, not simply a close approximation.

■ Having found that constitutional error did occur at trial, we must determine whether it requires reversal of Stoner's conviction. In *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Supreme Court held that Constitutional errors require reversal, unless they are deemed "harmless beyond a reasonable doubt." *Id.* In the past we have applied this standard to all Confrontation Clause cases whether they reached us on direct appeal or through collateral review. *See, e.g., Vincent v. Parke,* 942 F.2d 989, 992 (6th Cir.1991); *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir.1990); *Davis v. Jabe,* 824 F.2d 483, 487 (6th Cir.1987). Recently, the Supreme Court changed the rule. When reviewing a state trial through habeas corpus proceedings, we should apply the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). *Brecht v. Abrahamson,* — U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Therefore the violation of Mr. Stoner's Sixth amendment rights requires reversal of his conviction only if it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* at ——, 113 S.Ct. at 1711.

■ We find that the error charged here clearly had this required effect on Stoner's trial. As with the *Chapman* standard, the prosecutors bear the burden of proof and we must "review the entire record de novo in determining whether the error influenced the jury's deliberations." *Brecht,* — U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., Concurring). The prosecution's brief has offered little more than a conclusory statement that any error which may have occurred was harmless. Our review of the record, however, reveals that the depositions were the key piece of evidence. With respect to the Kaelin burglary, there is virtually no evidence independent of the Kaelins' testimony. There is no doubt that the guilty verdict on

that count was substantially influenced by the admission of that testimony. The deposition testimony also had substantial impact on the jury verdict on the Herman burglary. The depositions focused on the Kaelins' identification of their two watches which were recovered from Mr. Stoner. This testimony was crucial to both convictions. It was the only connection between Mr. Stoner and stolen goods. All of the other direct evidence merely placed Mr. Stoner in the vicinity of the burglaries. Mrs. Herman's stolen property was not found in Stoner's possession when he was arrested, and in fact was never recovered. Had the jury not believed that Stoner was wearing two watches stolen from the Kaelins earlier that day they may have been more inclined to believe that the state had not proved its case.

For the foregoing reasons, Stoner's petition for writ of habeas corpus must be granted. We reverse and remand this case to the district court with instructions to order the release of Mr. Stoner in the event that the Commonwealth does not grant him a new trial within a reasonable time.