21 F.3d 428
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Orville TACKETT, Petitioner-Appellant,
v.
Al C. PARKE, Warden, Respondent-Appellee.
 No. 93-5908.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1994.
 
 Before: KENNEDY, MILBURN, Circuit Judges, and ALDRICH, District Judge.[1]
 PER CURIAM.
 
 
 1
 Petitioner Orville Tackett appeals the denial of his petition for habeas corpus. Petitioner is currently confined following his December 1, 1988, conviction for intentional murder and is serving a twenty-year sentence. On appeal, petitioner claims that the District Court erred in finding that admission of certain statements obtained by the state police from petitioner after he had asserted his right to remain silent, violated his constitutional rights, but constituted harmless error. For the reasons stated below, we affirm.
 
 I.
 
 2
 Petitioner shot and killed his nineteen-year old second cousin, Mickey Hall. Petitioner was charged with intentional murder and brought to trial in April 1988. In that trial, the jury was unable to reach a verdict and a mistrial was declared. Petitioner was subsequently retried and the second jury returned a guilty verdict. At each trial, petitioner defended himself on the grounds of self-defense and testified on his own behalf that Hall ransacked petitioner's house. Also, petitioner testified that Hall left the house, then returned armed with some sort of a car chain and attacked petitioner.
 
 
 3
 Prior to each trial, a suppression hearing was held concerning statements and evidence obtained from petitioner by the police after he had invoked his Fifth Amendment right against self-incrimination. At the suppression hearing in the initial trial, Trooper Huepel testified that he read petitioner his Miranda rights after taking him into custody and petitioner acknowledged that he understood his rights. Trooper Huepel advised petitioner that he would like to talk to him "about the murder in question," but petitioner "said he would rather not talk at that time." After receiving this negative reply, Trooper Huepel asked petitioner if he knew where the gun was located. J.App. at 70, 102. Petitioner responded that he did know and led Trooper Huepel to a creek bank near his brother's house where the gun was recovered.
 
 
 4
 Based on this evidence in the first trial, the trial court sustained petitioner's motion to suppress evidence concerning the location of the gun after the shooting. However, the court granted the prosecution permission to ask petitioner to identify the gun if petitioner took the stand. Petitioner did take the stand in his own defense at the first trial and the prosecution asked questions concerning the gun as follows:
 
 
 5
 Counsel: Orville, is this your shotgun?
 
 
 6
 Tackett: Yes, sir.
 
 
 7
 Counsel: Is this what you shot Mickey with?
 
 
 8
 Tackett: Yes, sir.
 
 
 9
 J.App. at 85.
 
 
 10
 On cross-examination in the initial trial, petitioner testified that he came out of the back door of his house, "just out from [a] little building" on his property and admittedly shot the victim. J.App. at 86. Additionally, on cross-examination, petitioner testified as follows:
 
 
 11
 Counsel: Orville, after you shot Mickey, you went to your brother's house, was it?
 
 
 12
 Tackett: Yes.
 
 
 13
 Counsel: What did you do with the gun?
 
 
 14
 Tackett: I hid it down beside the creekbank.
 
 
 15
 Counsel: Why did you hide the gun?
 
 
 16
 Tackett: Well, I figured I would just hide it.
 
 
 17
 Counsel: Why did you hide the gun, Orville?
 
 
 18
 Tackett: Well, I don't know that. I waded across the creek back there, and I just laid the gun down. I never hid it. I laid the gun down beside of the creek bank. I never hid it.
 
 
 19
 J.App. at 91-92.
 
 
 20
 As stated, the jury was unable to reach a verdict in the initial trial. At the second trial, defense counsel renewed the motion to suppress the shotgun and the statement to Trooper Huepel about where the gun was. The court again heard the testimony of the officer and argument of counsel. The same trial judge overruled the motion to suppress the evidence of the location of the gun. Consequently, Trooper Huepel testified regarding petitioner's statement about the location of the gun and his action in taking the Trooper to find the gun. In the second trial, the jury returned a verdict adjudging petitioner guilty of murder. Petitioner then moved for a new trial arguing that he was inappropriately questioned after he invoked his Fifth Amendment right to remain silent. The court overruled the motion reasoning that even if petitioner's Fifth Amendment rights had been violated by the state police, petitioner had "waived it by coming forth with it himself on the first trial."
 
 
 21
 On direct appeal to the Kentucky Supreme Court, petitioner argued, among other things, that the trial court erred by overruling his motion to suppress statements about the gun made to Trooper Huepel. The Supreme Court of Kentucky affirmed petitioner's conviction finding no prejudice to defendant in the admission of his statement regarding the whereabouts of the gun.
 
 
 22
 Petitioner then filed a writ of habeas corpus in the United States District Court for the Eastern District of Kentucky alleging that his Fifth Amendment rights were violated by the continued questioning by Trooper Huepel after assertion of his right to remain silent. The State argued that petitioner had waived his Fifth Amendment rights as to the location of the gun because he testified about the gun's location in the first trial. The magistrate judge concluded that the questioning by Trooper Huepel violated petitioner's Fifth Amendment rights and stated,
 
 
 23
 [t]he admission of the evidence concerning the search for the gun after the shooting and its discovery on a creek bank near Petitioner's brother's house, however, was not testified to by Petitioner nor was that information submitted by any other manner. Therefore, it is questionable as to whether Petitioner waived his Fifth Amendment rights as to that evidence. However, the record clearly supports the conclusion that allowing this evidence to be admitted in the second trial, if error at all, was merely harmless error.
 
 
 24
 J.App. at 48.
 
 
 25
 The District Court denied the petition for habeas corpus because it agreed that the admission of evidence regarding the location of the gun constituted harmless error. This timely appeal followed.
 
 II.
 
 26
 The defendant argues that the state court committed constitutional error at the second trial by admitting evidence that petitioner told the police the gun was located on a creek bank near his brother's house and then showed them where the gun was located. See J.App. at 165-66, 226-27.
 
 
 27
 We note initially that despite the holdings of the magistrate judge and the District Court, petitioner did testify in the first trial regarding the location of the gun on a creek bank near his brother's house. See J.App. at 92. As a general rule, a defendant who chooses to testify waives his privilege against self-incrimination with respect to matters covered by his direct testimony and also subjects himself to cross-examination. Brown v. United States, 356 U.S. 148, 154-58 (1958). Furthermore, a defendant's testimony at trial is admissible against him in subsequent proceedings. Harrison v. United States, 392 U.S. 219, 222 (1968).
 
 
 28
 However, even if the introduction of petitioner's statement constituted error, we conclude that admission of his statement to the police regarding the location of the gun did not have a "substantial and injurious effect or influence in determining the jury's verdict, such that it resulted in actual prejudice." Brecht v. Abrahamson, 113 S.Ct. 1710, 1717, 1722 (1993).
 
 
 29
 The District Court employed the harmless error standard in Chapman v. California, 386 U.S. 18 (1967). In Chapman, the Supreme Court held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." Recently, the Supreme Court changed the rule. In Brecht, the Supreme Court enunciated the standard this Court must apply on habeas review of state court convictions. "If we conclude that a federal constitutional trial error[2] occurred at petitioner's trial, we must ascertain whether the error 'had substantial and injurious effect or influence in determining the jury's verdict' such that it resulted in actual prejudice." O'Neal v. Morris, 3 F.3d 143, 145 (6th Cir.1993) (citing Brecht, 113 S.Ct. at 1717, 1722). Additionally, "we review the entire record de novo in determining whether the error influenced the jury's deliberations." Brecht, 113 S.Ct. at 1723.
 
 
 30
 The parties dispute who bears the burden of proving the alleged error influenced the jury's deliberations. Petitioner relies on Stoner v. Sowders, 997 F.2d 209, 213 (6th Cir.1993), to support its argument that the government bears the burden. In Stoner, this Court stated, "[a]s with the Chapman standard, the prosecutors bear the burden of proof and we must 'review the entire record de novo in determining whether the error influenced the jury's deliberations.' " Id. (citations omitted). The state relies on O'Neal to support its argument that the petitioner bears the burden. In O'Neal, this Court stated, "[i]f we conclude that a federal constitutional trial error occurred at petitioner's trial, we must ascertain whether the error 'had substantial and injurious effect or influence in determining the jury's verdict' such that it resulted in actual prejudice. The habeas petitioner bears the burden of establishing such prejudice." Id. at 145 (citations omitted). This issue of who bears the burden of proof is not determinative here, as it is clear any alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict. Thus, we need not address this issue.
 
 
 31
 At trial, petitioner admitted shooting Hall, but claimed he acted out of self-defense. With respect to the gun, he testified that he carried it about a mile from where the shooting took place and laid it down on the creek bank, the same thing he had told the officers. He again repeated that he did not know why he laid it down there. He wasn't trying to hide it. J.App. at 179-80. Two eyewitnesses testified that Hall did not threaten or provoke petitioner but that petitioner attacked. J.App. at 112-14, 136-141. Petitioner objects to the strength of these witnesses' testimony because they were allegedly intoxicated at the time of the shooting. However, petitioner's counsel had elicited admissions from these witnesses on cross-examination concerning their intoxication and therefore this fact was before the jury. Also, the evidence shows that the deceased was shot while he was slumped over and petitioner was standing above him. J.App. at 157. Additionally, petitioner's testimony is inconsistent with the testimony of the medical examiner, the testimony of the county coroner and the physical evidence. See J.App. at 152-160, 170-78, 199-202.
 
 
 32
 In light of the foregoing, we agree with the District Court that any error that occurred at petitioner's trial constituted harmless error and therefore we affirm the District Court's order.
 
 III.
 
 33
 For the reasons stated, we AFFIRM.
 
 
 
 [1]
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [2]
 A constitutional error is one which " 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." Brecht, 113 S.Ct. at 1717 (citing Arizona v. Fulminante, 499 U.S. 279 (1991))